IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

NO. 97-30359
NO. 98-30203
_____

KATHRYN GWIN ELLISON; WHISKEY BAY ACRES L. L. C.;
DAVID M. ELLISON, JR., Plaintiffs - Appellants

vs.

WILLIAM L. CONNOR, District Engineer,
Department of the Army Corps of Engineers;
UNITED STATES OF AMERICA, on behalf of
U. S. Army Corps of Engineers, Defendants - Appellees

-----------------------------------------------------
UNITED STATES OF AMERICA,

Plaintiff - Counter Defendant - Appellee

vs.

JIMMY D. LAVIOLETTE,

Defendant - Counter Claimant - Appellant
_____

Appeals from the United States District Court
for the Western District of Louisiana
_____

September 11, 1998

Before KING and DAVIS, Circuit Judges, and VANCE[*], District Judge

SARAH S. VANCE, District Judge:

Before the Court are the consolidated appeals of Kathryn and

David Ellison ("Ellisons") and Jimmy D. Laviolette

("Laviolette").  The appellants appeal two adverse district court

decisions involving the U.S. Corps of Engineers' ("Corps")

_____

[*]    District Judge of the Eastern District of Louisiana,
sitting by designation.

refusal to issue permits allowing them to build camp-homes on their property in the Atchafalaya floodway. We agree with the district court that it lacked subject matter jurisdiction to review the Corps' permitting decision under the Administrative Procedure Act. We find that the district court erred in finding that the Ellisons lacked standing to assert constitutional due process claims, but we agree with the district court's reasoning that such claims are meritless. Finally, we affirm the district court's grant of summary judgment upholding the Corps' right to require Laviolette to remove his camp from the floodway.

## I.    Factual Background

In 1985, the Ellisons acquired 1206 acres of land from Texaco, Inc. in St. Martin Parish, Louisiana. The property fronts the Whiskey Bay Pilot Channel, a waterway that connects the Atchafalaya River and the Mississippi River. The Ellisons' land lies within the Whiskey Bay Pilot Channel Project, which was developed by the Corps as part of the Atchafalaya Basin Floodway System. The Project was authorized by Congress in legislation providing for flood control on the Mississippi River and its tributaries. *See* Mississippi River Flood Control Act, 49 Stat. 1508 (June 15, 1936).

The Ellisons purchased their tract subject to a "perpetual flowage, channel and disposal" easement that was granted to the

United States from the Texas Company on August 4, 1941.  The easement grants the United States broad, perpetual rights to enter, excavate, and flood the property, as well as to construct levees, embankments, bridges, highways, and utilities thereon, pursuant to its management of flooding and navigation on the Mississippi River and its tributaries.

The 1941 deed reserves to Texas Company and its assigns, in addition to certain rights related to mineral development, all rights and privileges that do not interfere with the easement. However, the deed contains a building restriction which requires the permission of the Corps to build any structures that "may in any way interfere" with navigation in any channel that "may be excavated" or with "the construction, maintenance or repair of any channels, or any levees or other works to be built" on the land.

In the early 1990s, Ellison sold two small tracts to third parties, and the United States acquired by condemnation the remainder of the 1206 acres.  However, on June 21, 1993 the United States revested in the Ellisons the 110.9 acres at issue in this case.

In reaching the agreement to revest the land, the Ellisons allege that the Corps orally agreed to grant permits for the development of recreational campsites on the property.  The only evidence of the alleged agreement was a June 30, 1993 letter from Thad J. Brown, Chief of the Real Estate Division of the

Department of the Army.  The letter provided in part:

> In connection with your request for an outline of
> our permit application process . . .
>
> Upon receipt of your [permit] request, we will .
> . . review for such things as present or future
> Corps activities in the area (future plans to
> widen, deepen, or move the channel, plans to
> dredge the channel), the historical,
> environmental and cultural resources of the
> planned site (Indian mounds or artifacts, eagle
> nest, etc.), and either approve the request, deny
> the request for specific reasons, or require
> modification to the request that we now negotiate
> with you.

The Ellisons proceeded to subdivide a portion of their property into 55 one acre lots, known as the Whiskey Bay Acres Subdivision.  By October 8, 1995, the Ellisons had sold 38 lots, including one to appellant Laviolette.  Laviolette's deed reflected the existence of the easement and recited the need to acquire a permit from the Corps before construction of any improvements.

Despite the language in his deed, Laviolette moved onto his lot a wooden camp-house in December 1994.  On April 13, 1995, the Corps advised Laviolette of the requirement to obtain a permit for the structure.  Laviolette responded by returning the letter with a handwritten note stating, "Please issue me a permit. Thank you, Jimmy D. Laviolette."  In addition to Laviolette, other lot owners submitted permit requests to the Corps.  The Ellisons did not submit a request for permit.

On October 10, 1995, the Corps notified Laviolette, Ellison

and the other lot owners that, after consideration of its present and future requirements, that appellee "found it to be in the best interest of the United States to prohibit the construction or placement of any structures on th[e] land." The letter further requested that any existing structures be removed. The Corps agreed, however, to allow the placement of easily removable items such as tents and wheeled trailers less than 40 feet long upon obtaining a real estate permit. It noted, however, that regulatory permits under the Clean Water Act would also be required if the property were determined to be wetlands.

On October 11, 1995, the Ellisons wrote to Colonel Clow, District Engineer of the Corps, outlining their understanding of the history of the problem and requesting a meeting. Clow met with the Ellisons and responded by letter on November 17, 1995, affirming the Corps' decision of October 10.

Clow noted that the Corps' letter of June 30, 1993 was based on the understanding that the Ellisons intended to apply for a single camp permit for their property. He stated that the Ellisons had not indicated their intent to subdivide the property, which would have met with a different response. Clow stated, "While it is true that we currently have no plans to modify the Whiskey Bay Pilot Channel, the dynamic nature of the Atchafalaya Basin may require such action in the future."

## II.  Proceedings Below

In response to the Corps' action, the Ellisons filed suit for declaratory relief and a stay of further action by the Corps. The Ellisons challenged the Corps' decision as arbitrary, capricious and made in violation of applicable permitting procedures.  They asserted that their due process rights were violated and that the Court should declare that they have the right to build the contested structures.  On September 1, 1997, the district court dismissed the action, holding that it lacked subject matter jurisdiction to review the Corps' decision under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*, as it was an action "committed to agency discretion by law" under § 701(a)(2) of the APA.  The district court also found that the Ellisons lacked standing to assert a constitutional due process claim and that such constitutional claims were meritless in any event.

Meanwhile, on February 18, 1997, the United States sued Laviolette to force him to remove his camp from the property covered by the easement.  Based on its interpretation of the easement granted in 1941, the district court granted the government's motion for summary judgment, finding that the Corps was "well within its rights" in denying Laviolette's permit and requiring him to remove the existing structure.  The court also held that there was no agreement binding the Corps to issue

6

Laviolette a permit.

These consolidated appeals challenge each of the district court's decisions.

## III. Standards of Review

This Court reviews a district court's dismissal for lack of subject matter jurisdiction de novo. *Carney v. Resolution Trust Corp.*, 19 F.3d 950, 954 (5th Cir. 1994).

We review a dismissal for failure to state a claim upon which relief may be granted under the same standard used by the district court: a claim may not be dismissed unless it appears certain that the plaintiffs cannot prove any set of facts in support of their claim that would entitle them to relief. *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994).

We review a district court's grant of summary judgment de novo, applying the same standard of review as would the district court. *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997). Summary judgment is proper only when it appears that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On summary judgment, the inferences to be drawn from the underlying facts contained in the record must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

7

## IV. The Ellisons' Appeal

The Ellisons assert that the district court erred in finding that the Corps' decision to deny permits was "committed to agency discretion by law" and hence was unreviewable under the APA. 5 U.S.C. § 701(a)(2).

The APA allows any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute" to obtain "judicial review thereof." 5 U.S.C. § 702. The APA precludes judicial review, however, when the "agency action is committed to agency discretion by law." *Id.*, § 701(a)(2).

The APA's exception to judicial review is "very narrow" and applies only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *citing* S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945); *Suntex Dairy v. Block*, 666 F.2d 158, 163-64 (5th Cir. 1982). An agency's own regulations can provide the requisite "law to apply." *McAlpine v. United States,* 112 F.3d 1429, 1434 (10th Cir. 1997); *Center for Auto Safety v. Dole*, 828 F.2d 799, 803 (D.C. Cir. 1987).

Under § 701(a)(2) of the APA, review is not available "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of

discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Accordingly, the Court has "emphasized that § 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based." *Webster v. Doe*, 486 U.S. 592, 600 (1988).

Finally, this Court has determined that practical policy issues also should be considered. *Bullard v. Webster*, 623 F.2d 1042, 1046 (5th Cir. 1980). We held in *Bullard* that "[t]here must be a weighing of the need for, and feasibility of, judicial review versus the potential for disruption of the administrative process." *Id.*

Even if the substance of an agency's decision is beyond review as discretionary, an agency's failure to follow its own regulations may be challenged under the APA. *See Webster*, 486 U.S. at 601 n.7 and cases cited therein.

**A.   Permitting Procedures**

In order to ascertain whether the relevant law gave the Corps discretion to deny the permits, the Court must first determine the authority upon which the Corps relied in making its decision. The Ellisons assert that the Corps' actions were governed by the Rivers and Harbors Act ("RHA"), 33 C.F.R. § 403, *et seq*., and the regulations adopted pursuant to that statute. Those regulations set out many substantive and procedural requirements for the issuance of permits. *See generally* 33

9

C.F.R. 320, 325, 330.  The Corps, however, argues that it made its permitting decision as a property owner under regulations adopted pursuant to 5 U.S.C. § 301.  That statute authorizes department heads to prescribe regulations for the use of a department's property.  *See* 5 U.S.C. § 301.  The Corps asserts that the applicable regulation is 33 C.F.R. § 211, which governs temporary uses of the Corps' own property and that this regulation commits the permitting decision to its discretion.

Appellants contention that the Corps necessarily acted under the RHA fails for three reasons.  First, the building restriction and permit requirement at issue derived from an easement, which is an interest in real estate owned by the United States.  This suggests the applicability of Section 211, which governs the Corps' real estate interests.  *See* 33 C.F.R. § 211 (governing "temporary use by others" of the Corps' real estate).  Further, the easement did not refer to RHA permitting procedures.  Indeed, in its October 1995 letter, the Corps described the permits in issue as "real estate permits" and informed landowners that regulatory permits could also have to be obtained, even if it issued a real estate permit to install a temporary camp.

Second, it would be pointless to obtain a broad, perpetual flowage easement if the only way the Corps could prevent potential obstruction of the easement was to use regulatory permitting procedures.  Third, depending on the nature of the

10

property, real estate permits could be required under the easement, <u>as well as</u> regulatory permits under the RHA or the Clean Water Act.

Further, we do not agree with appellants' argument that the Corps was required to follow the enumerated "regulatory policies" set out in 33 C.F.R. § 320 in dealing with its own real estate interests. Section 320.2(e) provides that for temporary uses of property constructed by the Corps, permits are to be issued under existing real estate regulations. In addition, Section 320.2 lists the source authorities for requiring regulatory permits, and none is as broad as the permit requirement stated in the easement. This suggests that the easement authorized the Corps to require permits in circumstances in which a regulatory permit would not be required. Thus, we find that the Corps acted as a property owner when it denied the permits.

When the Corps acts in a proprietary capacity, its conduct is governed by 33 C.F.R. 211. This regulation was adopted pursuant to 5 U.S.C. § 301, which provides that "The head of an Executive department or military department may prescribe regulations for the . . . custody, use, and preservation of its . . . property." Section 211 governs "temporary use by others" of the Corps' real estate. 33 C.F.R. § 211. "Real estate" is defined to include "rights-of-way or easements, whether temporary or permanent." § 211.1. In particular, § 211.9 applies to "Applications for leases, easements, licenses

11

and permits."  It provides:

> Applications for use of Civil Works property should be made to the District Engineer of the district within the boundaries of which the real estate is located. The District Engineer will determine whether the property will be required for public use during the period of the contemplated grant and whether the requested grant will interfere with any operations of the United States.

33 C.F.R. § 211.9.  No other procedural or substantive requirements are imposed on the Corps in making this determination.

Our review of the relevant statutory and regulatory framework convinces us that § 211.9 commits the permitting decision at issue to agency discretion and precludes judicial review.  In *Suntex Dairy,* we adopted a useful analytical framework for resolving this issue.  In that case, a statute required the Secretary of Agriculture to decide whether issuance of an order would "tend to effectuate the declared policy" of the relevant Act, which was, *inter alia*, to regulate milk marketing. *Suntex Dairy,* 666 F.2d at 160-61.  We found that this provision did not grant complete discretion to the Secretary because it also required her to hold a public hearing and imposed "rigorous obligations on the Secretary to develop an evidentiary record" to support her determination.  *Id.* at 164.  Another provision of the same law required the Secretary to determine whether a proposed order was "the only practical means of advancing the interests of the producers."  *Id.* at 161.  We found that this provision gave

12

the Secretary discretion because it did not require the consideration of specific factors, the making of findings or the development of any additional evidentiary record. *Id.* at 164-65. We noted that without these, the judiciary was in no position to gainsay the Secretary's determination as arbitrary, capricious or an abuse of discretion. *Id*. at 166.

Here, the statute authorizing Section 211.9, 5 U.S.C. § 301, does not contain standards or evidentiary requirements for the issuance of regulations. Further, the regulation in issue, § 211.9, lacks standards in the same way as the provision found discretionary in *Suntex*. Section 211.9 requires the Corps to determine whether the property in question will be "required for public use" during the period of the contemplated grant and "whether the requested grant will interfere with any operations of the United States." These standards are of the same level of generality as the discretionary statute in *Suntex*, which required the Secretary to determine whether an order "was the only practical means of advancing the interests of the producers." Further, as in *Suntex*, § 211.9 does not require the Corps to develop any factual record to support its determination.

In contrast, the RHA provides an example of a statute that does not give the Corps complete discretion over permits. A § 320.4 permit requires the Corps to consider the following in part:

13

> . . . All factors which may be relevant to the
> proposal must be considered including the
> cumulative effects thereof: among those are
> conservation, economics, aesthetics, general
> environmental concerns, wetlands, historic
> properties, fish and wildlife values, flood
> hazards, floodplain values, land use, navigation,
> shore erosion and accretion, recreation, water
> supply and conservation, water quality, energy
> needs, safety, . . . mineral needs,
> considerations of property ownership, . . ."

The regulation also sets forth pages of general criteria to be considered in the examination of every application. *Id.* Further, specific procedural requirements for processing applications and for providing public notice are also required. *Id.* § 325.1-3. In contrast to the extensive requirements of the RHA regulations, the broad language of § 211.9 does not require the Corps to weigh alternative uses of the property or to follow any particular permitting procedure.

The Supreme Court's decision in *Webster* further supports our conclusion. In *Webster*, a discharged CIA employee contended that his termination violated the agency's regulations. 486 U.S. at 600. The relevant statute allowed termination of a CIA employee whenever the Director "shall deem such termination necessary or advisable in the interests of the United States." *Id.* The Court held that the "standard fairly exudes deference to the Director." *Id.* The Court also based its decision on an analysis of "the overall structure" of the National Security Act, under which the CIA director was given responsibility to protect the integrity of

14

the agency and intelligence sources, which was essential to national security. *Id.* at 600-01.

As in *Webster*, the overall structure of 5 U.S.C. § 301 and 33 C.F.R. § 211 reinforces our conclusion. In addition to the language already cited, other language in Section 211 "exudes" discretion. For example, Section 211 authorizes the Secretary of the Army to issue leases "whenever he shall deem it to be advantageous to the Government." 33 C.F.R. 211.6(a)(1). The Secretary may grant an easement upon a finding that it is not incompatible with the public interest "and under such terms and conditions as are deemed advisable by him." *Id*. 211.6(b)(1)(i) and (iii). Further, because § 211 applies only to property interests owned by the government, the need for judicial review of decisions pursuant thereto is not compelling. In this case, a public interest determination was obviously made with respect to this property in 1941 when the United States obtained the perpetual easement to protect the public against flooding under the authority of national flood control legislation. We therefore agree with the district court's decision that it lacked jurisdiction to review the substance of the Corps' decision under the APA. In addition, while a claim that the Corps failed to follow applicable regulations would be reviewable, as noted above, appellants rely on procedures that are not applicable to the conduct at issue.

15

## B.    Constitutional Claims

The Ellisons also challenge the trial court's finding that there was no jurisdiction over their constitutional claims for injunctive relief, that they lacked standing to assert a constitutional claim against the Corps for damages, and that such a claim was deficient on the merits.

The trial court held that § 701(a)(2) of the APA precluded jurisdiction over appellants' constitutional claims for injunctive relief.  We disagree.  The United States Supreme Court has held that even if agency action is committed to its discretion by law, judicial review of constitutional claims is still available unless congressional intent to preclude review is clear.  *Webster*, 486 U.S. at 603; *see also Federal Deposit Ins. Corp. v. Bank of Coushatta*, 930 F.2d 1122, 1129-30 (5th Cir. 1991).  In *Webster*, the statute giving the Director of the CIA wide discretion to fire employees precluded an employee from challenging the Director's decision that the termination was in the interests of the United States.  However, the statute did not preclude consideration of "colorable" constitutional claims arising out of the actions of the Director pursuant to that statute.  486 U.S. at 603.  Likewise, although § 211 gives the Corps wide discretion to control its property, nowhere does it explicitly preclude constitutional claims.  Thus, the district court erred when it held that it lacked jurisdiction over the

16

Ellisons' due process claims for injunctive relief.

The district court correctly acknowledged that it had jurisdiction over the Ellisons' <u>damage</u> claims for due process violations under the Tucker Act, 28 U.S.C. § 1346.[1] However, the district court also found that the Ellisons lacked standing to assert such due process rights because they never actually applied for building permits.[2] This denial of standing was error.

To establish standing to challenge an allegedly unconstitutional policy, as a general matter "a plaintiff must submit to the challenged policy." *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997). The source of this requirement

_____

[1] The Tucker Act vests federal district courts with jurisdiction over damage "claim[s] against the United States, not exceeding $10,000 in amount, founded either upon the Constitution . . . or upon any express or implied contract with the United States. . . ." 28 U.S.C. § 1346(a)(2). The district court also found jurisdiction over appellants' contract claims for damages but found no claim was stated.

[2] The district court misidentified the source of this obligation as the "zone of interests" test discussed by the Supreme Court in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883 (1990). In *Lujan*, the Court held that a plaintiff must establish "that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Id.* This test is relevant when a plaintiff sues an agency pursuant to a statutory provision. For example, "if there is a statute preventing widget companies from selling law books, a law book company might sue to challenge an administrative regulation permitting the widget company to sell law texts." Erwin Chemerinsky, *Federal Jurisdiction*, § 2.3.6 at 97 (1994). The zone of interests test is not applied to constitutional claims such as the Ellisons' due process allegations. *Id.* at 98.

17

is the standing principle that a plaintiff "may not seek redress for injuries done to others."  *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972).  In *Moose Lodge*, the Supreme Court found that an African-American who never actually applied for membership to the Lodge lacked standing to challenge the club's all-white membership policy. *Id.* at 166-67.

This threshold requirement for standing may be excused, however, when a plaintiff makes a "substantial showing that application for the benefit . . . would have been futile." *Jackson-Bey*, 115 F.3d at 1096 (but rejecting futility argument on the facts).  In *Moore v. U.S. Department of Agriculture*, 993 F.2d 1222 (5th Cir. 1993), we recognized the futility doctrine when we found that white farmers did not have to complete an application to participate in a Farmers Home Administration program when the FMHA told them that the program was closed to whites.  *Id.* at 1222-24.  *See also Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996) (application for sign permits would be futile when city had sued plaintiffs to remove signs, and ordinance "flatly prohibited" the signs).

It would have been futile in this case for the Ellisons to apply for permits because the Corps sent them a letter on October 10, 1995 specifically stating that it would not permit the construction or placement of any structures on their land.  We will not require the Ellisons to ask the Corps for a permit to

18

build camp structures when the Corps has already made a determination that it will not allow them.  Accordingly, we hold that the Ellisons had standing to assert their due process claims.

While we find that appellants had standing to assert due process claims, we agree with the district court that, in any event, no such claim has been stated on the merits.  The appellants assert that the Corps' failure to follow its own procedures and its failure to honor the alleged June 1993 agreement deprived them of property without due process.

First, appellants were not deprived of any process to which they were entitled.  As explained above, the regulatory process established under the RHA was not applicable to the Corps' conduct here.  At most, the Corps was obligated to follow procedures under § 211.9.  When Colonel Clow explained that the "dynamic nature of the Atchafalaya Basin" could require future modification of the Whiskey Bay Channel, he made the requisite § 211.9 determinations that the property could be "required for public use" during the period of the contemplated grant and that the grant could "interfere with operations of the United States."

The alleged oral agreement also is not a basis for a due process violation by the Corps.  Appellants base their argument on our decision in *Taylor v. District Engineer,* 567 F.2d 1332 (5th Cir. 1978).  *Taylor*, however, involved regulatory activity

by the Corps under the RHA with regard to property owned by the plaintiff.  *Taylor* does not apply to the case at hand.

Moreover, the Corps followed the procedure it allegedly agreed to in the June 30, 1993 letter.  The letter indicates that the Corps would review any permit request for "such things as present or future Corps activities in the area" and reserved the right to deny the application.  Appellants did not establish that the Corps committed itself to any further procedural requirements.  Thus, appellants have not shown that they were denied any process to which they were entitled.

Further, the district court correctly found that there were no property rights as to which the landowners were deprived when the Corps denied permits for the structures at issue.

## V.   The Laviolette Appeal

The Laviolette appeal raises the issue of the extent of the Corps' rights under the easement.  Laviolette argues that the district erred in construing the easement as authorizing the Corps to deny permits if the structure could interfere in any way with potential projects that may be contemplated in the future.

The easement grants the United States the following rights:

> [T]he perpetual right, power, privilege, and
> easement or servitude, in, on, and to the lands
> described below; of entry thereon; of enlarging
> existing channels, and constructing, maintaining,
> operating drainage and navigation channels and
> cutoffs; improving and altering navigation and

20

> flow conditions, with the privilege of excavating
> any or all of the said land, and of depositing
> thereon excavated or dredged material and the
> water carrying same; of building, maintaining,
> enlarging and removing levees or other
> embankments; of constructing, maintaining and
> operating of bridges and appurtenant works; of
> constructing or rearranging, maintaining and
> operating of highways or roads and public
> utilities; of overflowing by drainage runoff, or
> by flood waters of the Mississippi River and its
> tributaries and outlets, and of performing and
> carrying out any other work that may be necessary
> and desirable in carrying out the provisions of
> Public Act No. 391 – 70th Congress, entitled "An
> Act for the control of floods on the Mississippi
> river and its tributaries, and for other purposes
> . . .

The easement explicitly reserves all rights that do not interfere with the easement to the owners of the property, in addition to reserving certain specific rights related to mineral development.  The grant requires, however, that if in the exercise of any reserved rights, the owners wish to erect any structure that "may in any way interfere" with navigation in any channel that "may be excavated," or "with the construction, repair and maintenance of any channels or levees or other works to be built upon the said land," the owners must first obtain permission from the Chief of Engineers.  The Corps explained that the purpose of the building restriction was to minimize the risk to human life and property in the event of flooding.

Laviolette argues that because the Corps' stated that it had no current plans to modify the channel, its statement that the dynamic nature of the Atchafalaya Basin may require such action

21

in the future was an insufficient basis to deny his permit.  We disagree.  We also find unpersuasive Laviolette's argument that his structure can be easily removed from the property on short notice if the Corps decides to flood the area or modify the channel.

As the district court noted, "When parties establish a servitude by contract and that contract provides the dimensions of the servitude, the contract governs the extent and the mode of the use of the servitude."  *Hostetler v. W. Gray & Company, Inc.,* 523 So.2d 1359, 1363 (La. App. 2d Cir. 1988).[3]  The language of the easement is unambiguous.  The building restriction clause requires permission from the Corps for structures that "may in any way interfere" with Corps projects that "may be excavated" or are "to be built" on the encumbered property.  This language does not restrict the Corps' rights to currently planned uses.

Moreover, the nature of the rights granted to the United States indicates that those rights apply to future, unplanned

---

[3]     The parties assume that Louisiana law applies to determine the scope and effect of the easement.  This conclusion is not axiomatic.  For example, when the government acquires property pursuant to a federal law that does not specify the appropriate rule of decision, the Supreme Court has held that federal common law applies to property disputes.  *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592-594 (1973).  The court may borrow state law principles to fashion the federal common law only if the state rules are not hostile to federal interests.  *Id*. at 595-96; *Georgia Power Co. v. 138.30 Acres of Land*, 617 F.2d 1112, 1115-18 (5th Cir. 1980).  In the case at hand, we do not find state law to be adverse to federal interests.

22

uses.  For example, an explicit purpose of the easement is to enable to Corps to provide flood control, which the Corps explained necessarily deals with unpredictable events.  If the Corps could not prevent the building of permanent structures except by showing a definite plan to alter the channel, the Corps' right to flood the property in the future would be difficult to enforce without endangering life and property.  We therefore find that the Corps' denial of the permit based on its determination that the dynamic nature of the Atchafalaya Basin "may require" modification of the channel "in the future" was within its rights under the easement.

## V.    Conclusion

For the foregoing reasons, we affirm the district court's determination that § 701(a)(2) of the APA precludes judicial review of the Corps' permitting decision as arbitrary and capricious.  While we reverse to the extent the district court found that it lacked subject matter jurisdiction over the Ellisons' constitutional claims and that they lacked standing to assert such claims, we agree those claims are meritless in any event.  Finally, we affirm the district court's grant of summary judgment in favor of the Corps in the Laviolette case.