IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 01-30385

CARLO J. CANOVA,

Plaintiff-Appellant,

versus

SHELL PIPELINE COMPANY;
EQUILON PIPELINE COMPANY, L.L.C.;
UNITED STATES OF AMERICA,

Defendants-Appellees.

Appeal from the United States District Court for
the Middle District of Louisiana
_____

May 7, 2002

Before KING, Chief Judge, REAVLEY and WIENER, Circuit Judges.

REAVLEY, Circuit Judge:

Plaintiff-Appellant Carlo Canova is the owner of Louisiana land over which the

United States acquired an easement for pipelines to access a storage facility in the

Strategic Petroleum Reserve (SPR).  Equilon Pipeline Company has leased the pipeline

from the United States for commercial use. Canova[1] seeks to enjoin this use by Equilon. The district court granted judgment in favor of Equilon and the United States denying the relief requested by Canova. We affirm.

I.    *Background*

In 1979, the United States Department of Energy exercised the power of eminent domain to acquire easements and property in a number of Louisiana parishes to facilitate the development of the Strategic Petroleum Reserve, as authorized by the Energy Policy and Conservation Act (EPCA).[2] Among the interests acquired was an easement across property belonging to Carlo Canova, necessary to the construction and operation of a thirty-seven mile pipeline connecting the government's Bayou Choctaw Oil Storage Facility (consisting of underground salt dome caverns), and the government's St. James Terminal facility on the Mississippi River.

After an asset utilization review in the early 1990s, the Strategic Petroleum Reserve Management Office decided to lease the Bayou Choctaw Pipeline to reduce

---

[1] Canova filed his complaint as a putative class action on behalf of himself and other property owners whose land was made subject to easements for the Bayou Choctaw Pipeline. The district court exercised its discretion to rule on the defendants' motion for summary judgment prior to determining whether class certification was appropriate, so Canova is the sole plaintiff.

[2] 42 U.S.C. § 6239(f)(1)(B) (1995) (amended 2000).

operating costs and increase government revenue. Equilon successfully bid on the lease of the pipeline, and the lease was executed in May 1997. Under the lease, Equilon has the right to use the pipeline to transport oil commercially in exchange for rental payments and assumption of responsibility for maintenance of the pipeline. The government retains the right to priority use of the pipeline to access the Bayou Choctaw Storage Facility in the event of a national energy emergency and to transport oil through the pipeline during non-emergencies at Equilon's published rates. The government may also conduct annual system test exercises using the pipeline, to be scheduled and coordinated with Equilon to minimize interruption of the pipeline's commercial use. There is no dispute that the United States has exercised its right under the lease to use the pipeline for the transport of SPR oil.

Canova sued Equilon in state court seeking to enjoin it from continuing to use the pipeline for private profit, a use which Canova argues falls outside the scope of the easement taken by the Government. Canova's original state court petition alleged that Equilon's use of the easement was in bad faith and that it was unjustly enriching itself by that use, and requested a "determination of the legal rights, duties and obligations obtained by and imposed on the Department of Energy as a result of the granting of rights of way or easements." In his motion to remand the case after removal to federal court,[3] Canova claimed not to "contest the right, title or interest of the United States of America

---

[3] Removal jurisdiction was properly exercised by virtue of diversity of the parties and an amount in controversy exceeding $75,000. 28 U.S.C. § 1441(a).

3

nor its right to lease to [Equilon] or its assigns.  Plaintiff only contests the rights of

[Equilon] or its assigns to utilize the line for a purpose contrary to the purposes for which

the acquisition was authorized."  Despite this disclaimer, the district court determined

that the United States was a necessary party to the litigation due the nature of the relief

sought, and ordered its joinder.

The district court ultimately granted summary judgment in favor of Equilon and

the United States, holding that the easement taken by the United States is not restricted in

scope to uses furthering the Strategic Petroleum Reserve, and that the lease with Equilon

in any case serves the Strategic Petroleum Reserve's purposes.  It is from that judgment

that Canova appeals.

*II.*      *Analysis*

Summary judgment is reviewed *de novo*,[4] and is appropriate when, viewing the

evidence in the light most favorable to the nonmoving party, no genuine issue of material

fact exists, and the moving party is entitled to judgment as a matter of law.[5]  No facts of

any significance are in dispute in this case.  Only questions of law are before us.

---

[4] Maher v. Strachan Shipping Co., 68 F.3d 951, 954 (5th Cir. 1995).

[5] See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

*A.*      *Scope of the Government's Property Interest*

Canova argues that the property interest actually taken by United States pursuant to the Declaration of Taking does not allow for any commercial use of the pipeline. When a declaration of taking is filed, "title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States."[6] The issue before us is the nature of the estate or interest in land taken and paid for by the United States, and whether the government's lease of the pipeline to Equilon for commercial use exceeds the scope of that interest.[7]

The Declaration of Taking, entered in the Middle District of Louisiana in 1979, describes a taking of:

> A perpetual and assignable easement and right-of-way 50 feet in width, in, on, over and across the land for the location, construction, operation, maintenance, alteration, repair and patrol of the multipipelines in the establishment, management and maintenance of the Strategic Petroleum Reserve, as authorized by the Act of Congress approved December 22, 1975, Public Law 94-163, 89 Stat. 871, 42 U.S.C. § 6201, including the right to trim, cut, fell and remove therefrom all trees, underbrush, obstructions and any other vegetation, structures or obstacles within

---

[6] 40 U.S.C. § 258a.

[7] The United States argued in the district court that this case is in effect a real property quiet title action against the government as provided for by 28 U.S.C. § 2409a(a) ("The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest . . . ."). No party has further discussed this characterization on appeal.

the limits of the right-of-way; reserving, however, to the landowners, their heirs and assigns, all such rights and privileges as may be used without interfering with or abridging the rights and easements hereby acquired; subject, however, to existing easements for public roads and highways, public utilities, railroads, pipelines, and existing easements for drainage facilities of Iberville Parish, Louisiana.

In determining the nature of the interest the government has acquired through the condemnation proceedings, we are first confronted with a choice of law problem: do we look to federal common law, or state property law?   "[W]hen the government acquires property pursuant to a federal law that does not specify the appropriate rule of decision, the Supreme Court has held that federal common law applies to property disputes."[8] Even once we establish that federal common law applies in this situation, we must still decide "whether the court should apply uniform national law or should apply, as federal law, the law of the state where the property is located."[9] We will decline to borrow state law principles as rules of decision if the state rules are hostile to federal interests, or if federal uniformity is required.[10]

In the present case, use of Louisiana law is problematic not because its rules are

---

[8] Ellison v. Connor, 153 F.3d 247, 256 n.3 (5th Cir. 1998) (citing United States v. Little Lake Misere Land Co., 412 U.S. 580, 592-94 (1973)); United States v. Pinson, 331 F.2d 759, 760 (5th Cir. 1964) (applying principles of "general law" to determine whether a federal taking was subject to a flowage easement).

[9] Georgia Power Co. v. Sanders, 617 F.2d 1112, 1113 (5th Cir. 1980) (applying state law as the federal rule of decision in determining compensation owed for a federal taking).

[10] Ellison, 153 F.3d at 256 n.3; Central Pines Land Co. v. United States, 274 F.3d 881, 890 (5th Cir. 2001).

necessarily hostile to federal interests as a matter of policy, but because the interest in the Declaration defines the taking in common law terms (an "easement"), and Louisiana civil law uses an entirely different terminology (predial and personal servitudes) for classifying limited interests in land. Because Louisiana law does not speak in terms of "easements" at all, we apply general common law principles in determining the government's interest.[11]

Using common law property principles, the interest described in the instant Declaration of Taking resembles an easement in gross, which runs in favor of a person (natural or legal), rather than a dominant estate.[12] At common law, easements in gross were historically presumed to be non-transferable, but the almost universally accepted rule is now that easements in gross taken for commercial purposes, particularly public utility purposes such as railroads, telephone lines, and pipelines, are freely transferable

_____

[11] The government took and paid for an interest called an "easement," and we will measure its rights in the land in accordance with the terminology it chose to use in the Declaration of Taking, where its title originated. Cf. Little Lake, 412 U.S. at 597 (declining to apply Louisiana law as the federal rule of decision where to do so would abrogate the explicit terms of a federal land acquisition and frustrate the United States' bargained-for contractual interests). We recognize that Little Lake involved a direct state law interference with federal property interests which is not the case here, but we believe the Declaration of Taking in this case sufficiently invoked the common law paradigm to make application of the civil law servitude framework in tension with the United States's understanding of the interest that it took.

[12] RESTATEMENT (THIRD) OF PROPERTY § 1.5(2).

property interests.[13]

But having established the general type of interest in land at issue, a commercial easement in gross, we must still determine the effect of language in the Declaration of Taking pertaining to the purposes for which the taking was made. Easements may be limited not only as to physical scope, but also as to purpose.[14] The Declaration of Taking in the present case provides that the easement is acquired "for the location, construction, operation, maintenance, alteration, repair and patrol of the multipipelines in the establishment, management, and maintenance of the Strategic Petroleum Reserve."

The United States argues that the reference to the Strategic Petroleum Reserve is in effect a recitation of the legitimate public purpose of the taking, but is not intended to act as an additional limitation on the permissible scope of the easement's use. In other words, this portion of the sentence ("in the establishment, management, and maintenance of the Strategic Petroleum Reserve") states why the Government took the easement, but does not limit what it took. Canova argues that this clause does in fact impose a limitation on the scope of the easement, and that the easement acquired by the

---

[13] RESTATEMENT (THIRD) OF PROPERTY § 4.6 cmt. b; 25 AM. JUR. 2D *Easements and Licenses in Real Property* § 102 (1996) ("Easements in gross may be made assignable . . . by the terms of the instrument creating the right, particularly where the easement is of a commercial character, such as an easement for a pipeline, telegraph and telephone line, or railroad right of way.").

[14] 25 AM. JUR. 2D *Easements and Licenses in Real Property* § 81 (1996) ("The rights of any person having an easement in the land of another are measured and defined by the purpose and character of the easement.").

8

government permits use of his land exclusively for the establishment, management and maintenance of the Strategic Petroleum Reserve. Because Equilon's use of the pipeline serves a private profit interest, Canova argues, Equilon must either pay more money to compensate for the additional privilege of for-profit usage or be enjoined from continuing to use the pipeline for commercial gain.[15]

In construing a declaration of taking, "the intention of the United States as author of the declaration, to be gathered from the language of the entire declaration and the circumstances surrounding it, must be considered."[16] Our job is not to strictly construe the declaration in favor of the landowner, as urged by Canova, but to determine what interest in land the government has already taken and paid for.[17]

For several reasons we accept the argument that the reference to SPR purposes does not impose an additional limitation on the scope of the interest in land taken by the government. First, Canova's interpretation that any end use of the pipeline must be for

_____

[15] Having reviewed Canova's pleadings and briefing, it does not appear that he is seeking damages from the *United States* for exceeding the scope of the easement, which might be redressible only under the Tucker Act, 28 U.S.C. § 1491, and might be subject to exclusive jurisdiction in the Claims Court depending on whether his damages exceed $10,000. See Narramore v. United States, 960 F.2d 1048, 1050-51 (Fed. Cir. 1992). Canova has never pleaded a claim under the Tucker Act in this case, and has primarily targeted Equilon for its requested relief.

[16] Pinson, 331 F.2d at 760-61.

[17] The authority cited by Canova for his "strict construction" argument relates to strict construction of expropriation or eminent domain *statutes*, not instruments of takings.

SPR purposes is at odds with the easement's character as assignable. Assignable means, "[t]hat can be assigned; transferable from one person to another, so that the transferee has the same rights as the transferor had."[18] Because no entity but the government can use the pipeline for SPR purposes, a restriction on use to that end would render virtually meaningless the clause authorizing assignment.[19] Canova attempts to explain his way around this problem with the counter-interpretation that "assignable" means the government may assign its "management and maintenance duties" to a third party. This equates "assignable" with the right to enter a maintenance or management contract, rather than the right to transfer an interest in property.

Second, there is another possible explanation for inclusion of the language referring to the SPR other than as a limitation on the scope of the easement. The federal Declaration of Takings Act requires "[a] statement of the authority under which and the public use for which said lands are taken."[20] The reference to the Strategic Petroleum Reserve, followed immediately by a citation to the EPCA, is consistent with the statutorily mandated recitation of purpose.[21] The government's separate recitation of

---

[18] BLACK'S LAW DICTIONARY (7th ed. 1999).

[19] See LaFargue II, 4 F.Supp.2d at 604.

[20] 40 U.S.C. § 258a(1).

[21] See Boorstein v. Massachusetts Port Authority, 370 Mass. 13, 16, 345 N.E.2d 668, 670 (1976) (holding that a reference to the Naval Fuel Depot in a declaration of taking used to condemn a pipeline easement was a recitation of purpose, not a limitation on scope).

public uses for the condemned land also provides that "the said land has been selected for acquisition by the United States for the Strategic Petroleum Reserve and for such other uses as may be authorized by Congress or by Executive Order," which is strong if not conclusive evidence that the estate in land taken is not itself limited in scope to SPR purposes.

Third, reading the Declaration informed by common law property principles, the government's interpretation of the easement is more consistent with the typical focus on the burden placed on the servient estate rather than the intended purpose behind the use of the easement.[22] Courts might find an additional burden on the fee where the commercial enterprise or public utility use is no longer the same, for example where a railroad easement is used or leased for the construction of telephone lines,[23] or where an agricultural easement holder uses the easement for recreation.[24] In contrast, where the

---

[22] See, e.g., Ziegler v. Ohio Water Serv. Co., 247 N.E.2d 728, 731 (Ohio 1969) (deciding whether construction of water pipes connected with preexisting highway easement constituted an additional burden on the fee, such that additional compensation was in order).

[23] Buhl v. U.S. Sprint Communications Co., 840 S.W.2d 904, 912-13 (Tenn. 1992) (holding that addition of a telephone cable line onto a railroad easement constituted an additional burden on the fee, entitling the landowner to additional compensation).

[24] Riverton Farms, Inc. v. Castle, 441 N.W.2d 405, 407 (Iowa Ct. App. 1989) (finding that easement holders created an additional burden on the land by using an easement for recreational purposes rather than for use in moving cattle and farm equipment).

11

change to an easement's use is "merely one of quality and not substance," there is no added burden to the underlying fee simple estate.[25]

Read in this light, it makes little sense to think that the government would have reserved an interest in land that hinged on the intended purpose behind the same physical use, especially when the easement is "perpetual and assignable." We need not determine whether the scope of the easement is effectively limited to use for "pipeline purposes," i.e. "for the location, construction, operation, maintenance, alteration, repair and patrol of the multipipelines," because there is no argument or evidence to suggest that Equilon's use under its lease with the United States in any way falls outside of this possible limitation on scope. We find that the Declaration of Taking's statement that the pipeline easement is taken for use "in the establishment, management, and maintenance of the Strategic Petroleum Reserve" is not a restriction on the scope of the easement as an interest in land. Equilon's use is thus not unlawful as outside the scope of the interest taken.

B.      *Authorizing Language in the EPCA*

---

[25] Chevy Chase Land Co. v. United States, 733 A.2d 1055, 1077 (Md. 1999) (quoting Reid v. Washington Gas Light Co., 194 A.2d 636, 638 (Md. 1963)); see also Orange County, Inc. v. Citgo Pipeline Co., 934 S.W.2d 472, 475 (Tex.App.–Beaumont 1996) (finding easement to be partially alienable where "the resulting use does not burden the underlying land beyond what was contemplated in the original easement grant.").

Canova also argues that even if the Declaration of Taking purported to take an interest in land consistent with the present lease arrangement, the lease is still not authorized by any Act of Congress. The exact nature of Canova's argument on the constraints imposed by the EPCA is not entirely clear.

The EPCA authorizes the Energy Secretary to "acquire by purchase, condemnation, or otherwise, land or interests in land for the location of storage and related facilities" to the extent "necessary or appropriate" to implement the Strategic Petroleum Reserve plan.[26] Canova does not take issue with the initial seizure of his property or argue that the taking was made in bad faith.

Instead, his concern is that the property was taken for SPR purposes and is now being used for private gain. Taken to its logical conclusion, his statutory argument appears to be that if an interest in land taken to serve the Strategic Petroleum Reserve falls into disuse, complete or partial, the federal government must let the property sit idle. This option cannot be squared with the EPCA's express language, which provides that "[t]o the extent necessary or appropriate to implement the Strategic Petroleum Reserve Plan which has taken effect pursuant to subsection (a) of this section, the Secretary may use, lease, maintain, sell, or otherwise dispose of storage and related facilities acquired

---

[26] 42 U.S.C. § 6239(f)(1)(B) (1995) (amended 2000). The amended provision states, "[i]n order to develop, operate, or maintain the strategic petroleum reserve, the Secretary may acquire by purchase, condemnation, or otherwise, land or interests in land for the location of storage and related facilities." 42 U.S.C. § 6239(f)(2).

pursuant to this part."[27]

Although Canova has requested an injunction prohibiting Equilon "from using the SPR pipeline in any manner inconsistent with the EPCA," he has not identified any portion of the Declaration of Taking that is not authorized by the enabling authority of the EPCA, and has not explained how the lease to Equilon is inconsistent with the EPCA when lease, sale or other disposal of SPR facilities "acquired pursuant to this part" is plainly authorized. The EPCA is lacking in language mandating eternal use of SPR facilities for SPR purposes, recognizing that needs can change and that the Secretary should retain flexibility to dispose of such property that is no longer needed or being fully utilized. Finally, Canova's argument that post-acquisition, non-public use of property acquired pursuant to the government's powers of eminent domain violates the Fifth and Fourteenth Amendments is new on appeal, and we decline to consider it.[28]

III.    *Conclusion*

---

[27] 42 U.S.C. § 6239(f)(1)(D) (1995) (amended 2000). The amended version reads, "[i]n order to develop, operate, or maintain the strategic petroleum reserve, the Secretary may (4) use, lease, maintain, sell or otherwise dispose of *land or interests in land*, or of storage and related facilities acquired under this part, under such terms and conditions as the Secretary considers necessary or appropriate." 42 U.S.C. § 6239(f)(4) (emphasis added). The parties assume without comment that the previous version of the statute governs the validity of the lease. Canova has made no statutory argument that the easement itself is not a "facility" within the meaning of the 1995 version of the statute.

[28] Leverette v. Louisville Ladder Co., 183 F.3d 339, 342 (5th Cir. 1999).

The Declaration of Taking filed by the government resulted in the government's acquisition of an easement not limited in scope to Strategic Petroleum Reserve purposes. Furthermore, we find nothing in the EPCA that prohibits Equilon's lease of the pipeline for commercial use, given the statute's express provision that facilities acquired under the EPCA may be leased, sold, or otherwise disposed of as necessary or appropriate to implement the government's SPR plan. Accordingly, the judgment of the district court in favor of Equilon and the United States is affirmed.