115 F.3d 1091
 Travis JACKSON-BEY, Plaintiff-Appellant,
v.
Robert HANSLMAIER, Superintendent of Woodbourne Correctional
Facility, Lieutenant Jones, Watch Commander at Woodbourne
Correctional Facility, individually and in their official
capacities, Philip Coombe, Commissioner of New York,
Department of Correctional Services, Sylvia A. Laguna,
Director of the Inmate Grievance Resolution Committee,
Defendants-Appellees.
 No. 471, Docket 96-2349.
 United States Court of Appeals,
Second Circuit.
 Submitted Oct. 28, 1996.
Decided May 30, 1997.
 
 Travis Jackson-Bey, pro se, Woodbourne, NY, for Plaintiff-Appellant.
 Kathleen P. Murray, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General, New York, Thomas D. Hughes, Assistant Solicitor General), for Defendants-Appellees.
 Before KEARSE, WALKER, and JACOBS, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 In March of 1995, plaintiff Travis Jackson-Bey, an inmate at Woodbourne Correctional Facility in New York ("Woodbourne"), commenced this action pro se under 42 U.S.C. § 1983, alleging that Woodbourne officials Robert Hanslmaier, acting superintendent, and Lieutenant Jones, watch commander, violated the Free Exercise Clause of the First Amendment by precluding him from wearing to his father's funeral white garments and a red fez as prescribed by his religion, Moorish Science Temple ("MST"), an Islamic sect. Jackson-Bey alleges that this denial was part of a pattern of discriminatory acts by defendants against Woodbourne inmates who adhere to the beliefs of the MST.
 
 
 2
 Jackson-Bey appeals from the order of the United States District Court for the Southern District of New York (Charles S. Haight, Senior District Judge ) dismissing his complaint without prejudice for lack of standing based on Jackson-Bey's failure to register as an MST member on facility records as required by Woodbourne. Because we agree with the district court that Jackson-Bey's failure to register bars his present action, we affirm.
 
 BACKGROUND
 
 3
 I. Religious Accommodation Program at Woodbourne
 
 
 4
 Because Jackson-Bey challenges the actions of prison officials in implementing the policy for accommodating the religious beliefs of inmates at Woodbourne, a brief review of that policy is necessary.
 
 
 5
 The official policy is codified in Department of Correctional Services ("DOCS") Directive No. 4202, applicable to prison facilities throughout New York. That directive designates the Senior Chaplain to serve as the principal advisor to Woodbourne's superintendent on religious activities; the Senior Chaplain is responsible for planning the prison's religious program, including gauging the religious needs of the inmate population and identifying resources necessary for the conduct of the religious program. Religious Programs & Practices, DOCS Directive No. 4202(B) dated Nov. 26, 1982. Defendants claim that "[w]hen certification through a Chaplain indicates a clearly defined ecclesiastical requirement, adjustments or accommodations can be made to departmental policy in limited ways." Defs.' Resp. to Pl.'s First Set of Admis., Sept. 12, 1995 (No. 95 Civ. 2349(CSH)). In an effort to meet the religious needs of the inmate population, the directives provide for accommodations to allow inmates to gather for the purposes of religious study and for the observation of religious days of celebration and Sabbaths. DOCS Directive No. 4202(C), (D), & (E). In addition, Woodbourne procedures allow inmates to wear religious medals, head coverings, and special garments. DOCS Directive No. 4202(J); Religious Head Coverings, Mem. dated Aug. 8, 1990.
 
 
 6
 Not all religious needs can be accommodated at Woodbourne consistent with penological requirements, however, and DOCS Directive No. 4202 spells out certain aspects of the prison's religious program, including some limitations to the exercise of religious freedom by inmates.
 
 
 7
 Because of staffing, space, and security considerations, it may be necessary to restrict the attendance of inmates at religious activities as follows:
 
 
 8
 1. Participation in a religious celebration, service, or study group by an inmate is voluntary.
 
 
 9
 2. An inmate may attend only the religious programs of his designated religion as noted in facility records.
 
 
 10
 3. Inmates who desire to learn about the religious practices of another faith may do so after consultation with the Senior Chaplain who will determine when their attendance can be accommodated at a service or study session.
 
 
 11
 4. After consultation with his spiritual advisor and the Senior Chaplain, an inmate may change his religious affiliation. The Senior Chaplain will make the necessary changes in facility records.
 
 
 12
 DOCS Directive No. 4202(F). In addition, "[i]nmates are not allowed to wear garb of religions not their own." Defs.' Resp. to Pl.'s Second Set of Interrogs., Sept. 12, 1995 (No. 95 Civ. 2349(CSH)).
 
 
 13
 Central to this case is the registration requirement referred to in subparagraphs 2 and 4 of DOCS Directive No. 4202(F) above. As described in the affidavit of Woodbourne's Senior Chaplain, Reverend Randolph Fields, the registration procedure provides that a prisoner may identify his religious affiliation on his initial intake records. Aff. of Rev. Randolph Fields dated Jan. 23, 1996 (No. 95 Civ. 2349(CSH)) ("Fields Aff."). At any time thereafter, a prisoner may change his registered religion by completing a one-page form in the presence of a prison chaplain. Id. That form requires an inmate to fill in his name, the religion to which he wishes to change his religious preference, and the religion with which he was previously affiliated. Id.
 
 
 14
 Also significant in this action is DOCS Directive No. 4901 which codifies DOCS's policy on the attire an inmate must wear on funeral visits. Defendants have not provided a copy of DOCS Directive No. 4901 for the record. However, defendants' response to Jackson-Bey's interrogatory requests contained the unopposed assertion that the directive provides that all inmates are required to wear state-issued civilian clothing to funeral services. Neither plaintiff nor defendants have pointed to any DOCS directive that allows an inmate to bring special religious garments to a funeral. However, defendants admit that where an inmate's religion, as registered with Woodbourne, prescribes special funeral garments, they will allow the inmate to wear those garments. Defs.' Resp. to Pl.'s Second Set of Interrogs., Sept. 12, 1995 (No. 95 Civ. 2349(CSH)) (stating that inmate Muhammed Abdul Jabbar, a registered Muslim, was allowed to bring to and use garments at his daughter's funeral).
 
 
 15
 II. Denial of Jackson-Bey's Request for Religious Accommodation
 
 
 16
 The events underlying the present action began in late February of 1995, when Jackson-Bey was notified of his father's death and granted permission to attend the funeral services. On February 22, 1995, Hajji H.A. Muhammad, an Islamic Chaplain at Woodbourne, wrote a memorandum advising the watch commander, defendant Lieutenant Jones, that Jackson-Bey was "for religious/ SPIRITUAL REASONS permitted to attend memorial services (for his father)" in the attire prescribed by his religious order, MST, including white garments and a red fez. Religious Advice on Funeral Trip of Travis Jackson, Mem. dated Feb. 22, 1995.
 
 
 17
 Because Jackson-Bey was not registered as a member of the MST on Woodbourne facility records, defendants did not allow Jackson-Bey to wear the religious clothing prescribed by the MST faith; instead, they required him to wear state-issued western style clothing to the funeral pursuant to DOCS Directive No. 4901. Believing that by not wearing white garments and the red fez, he would disgrace his father's memory and betray his MST faith, Jackson-Bey chose not to attend the funeral. He was thus unable to fulfill his religious obligation to perform a final prayer at his father's memorial service.
 
 
 18
 Following this incident, Jackson-Bey filed an administrative grievance claiming a denial of his religious rights and seeking "[a] written formal apology, as well as facility and departmental respect and recognition of the Islamic sects." Inmate Grievance Complaint dated Feb. 24, 1995, No. WB 8/28/95, Woodbourne Correctional Facility. Defendant Lieutenant Jones responded to the grievance by simply stating that pursuant to DOCS Directive No. 4901, all inmates are required to wear state-issued civilian clothing to funeral services. Inmate Grievance Program, Investigative Report Form.
 
 
 19
 On March 6, 1995, Jackson-Bey, acting pro se, filed the present action against the defendant prison officials under 42 U.S.C. § 1983, claiming that the defendants violated the Free Exercise Clause of the First Amendment when they denied him permission to wear the MST prescribed clothing to his father's funeral. Jackson-Bey further asserted that the funeral incident was part of a pattern at Woodbourne of religious suppression that included denying MST members permission to worship in congregations or to have study classes.
 
 
 20
 On August 1, 1995, Jackson-Bey filed a motion for a preliminary injunction to enjoin the defendants from interfering with the exercise of the MST religion at Woodbourne and from retaliating against MST members for filing suit. In response, defendant Hanslmaier claimed in an affidavit that Jackson-Bey lacked standing to file his action. Hanslmaier stated that Jackson-Bey was "registered as a member of the Muslim religion and has refused to change his registration to Moorish Science Temple (when asked directly by the facility Senior Chaplain) as required by Department Directive." Aff. of Robert L. Hanslmaier dated Aug. 16, 1995 (No. 95 Civ. 2349(CSH)). In reply, Jackson-Bey replied with an affidavit stating that he had never been asked by the Senior Chaplain to change his religious registration. Aff. of Travis Jackson-Bey dated Aug. 31, 1995 (No. 95 Civ. 2349(CSH)). Reverend Fields subsequently filed an affidavit admitting that Jackson-Bey had "made overtures to [him] concerning the Moorish Science Temple ... religion." Fields Aff. However, Reverend Fields stated that while he asked Jackson-Bey "both in 1994 and again in 1995, if he wished to change his religious preference on facility records," id., Jackson-Bey did not do so.
 
 
 21
 On December 7, 1995, the district court ordered the parties to brief the issue of Jackson-Bey's standing to bring the present action. They did so, and on April 11, 1996, the district court dismissed Jackson-Bey's complaint on the ground that because he had failed to register as a member of MST, he lacked standing to bring this suit. Jackson-Bey v. Hanslmaier, No. 95 Civ. 2349(CSH), 1996 WL 173156 (S.D.N.Y. Apr.11, 1996). Jackson-Bey appeals from this dismissal.
 
 DISCUSSION
 
 22
 Because the judicial power of the United States extends only to the resolution of cases and controversies, U.S. Const. art. III, § 2, courts have always required that a litigant have "standing" to challenge the action sought to be adjudicated. Arizonans for Official English v. Arizona, --- U.S. ----, ----, 117 S.Ct. 1055, 1067, 137 L.Ed.2d 170 (1997); Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 471, 102 S.Ct. 752, 757-58, 70 L.Ed.2d 700 (1982). "[T]he law of Art. III standing is built on a single basic idea--the idea of separation of powers." Allen v. Wright, 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). Thus, the standing inquiry
 
 
 23
 must be answered by reference to the Art. III notion that federal courts may exercise power only "in the last resort, and as a necessity," Chicago & Grand Trunk R. Co. v. Wellman, 143 U.S. 339, 345[, 12 S.Ct. 400, 402, 36 L.Ed. 176] (1892), and only when adjudication is "consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process," Flast v. Cohen, 392 U.S. 83, 97[, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947] (1968).
 
 
 24
 Allen, 468 U.S. at 752, 104 S.Ct. at 3325.
 
 
 25
 Though some of the elements of standing reflect merely prudential considerations that are part of judicial self-government, "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); Valley Forge, 454 U.S. at 471, 102 S.Ct. at 757-58. At a minimum, Article III requires the party who invokes the court's authority to show that (i) he personally has suffered some actual or threatened injury as a result of defendants' putatively illegal conduct; (ii) the injury is fairly traceable to the challenged action; and (iii) the injury is likely to be redressed by a favorable decision. Id. at 472, 102 S.Ct. at 758-59. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).
 
 
 26
 In the instant action, because any injury suffered by Jackson-Bey results from his own decision not to follow the simple procedure of registering his religion and because Jackson-Bey has failed to make a substantial showing that registering his religious affiliation would have been futile, we agree with the district court that Jackson-Bey has no standing to bring the action.
 
 
 27
 We review questions of standing de novo. Fund for Animals v. Babbitt, 89 F.3d 128, 132 (2d Cir.1996). Plaintiff bears the burden of alleging sufficient facts to support standing, although at this stage, we accept as true all material facts in the complaint and construe the complaint in favor of the complaining party. Warth, 422 U.S. at 501, 95 S.Ct. at 2206-07; Albuquerque Indian Rights v. Lujan, 930 F.2d 49, 55 (D.C.Cir.1991).
 
 
 28
 Jackson-Bey challenges neither the efficacy nor the constitutionality of the registration requirement; nor does he question that it is an appropriate threshold for standing to sue on a claim of impairment of a free exercise right. Rather he asserts that his failure to register should be excused on the ground that registration in his case would have been futile because Woodbourne's records indicate that it only recognizes two Islamic sects--Sunni Muslim and American Muslim Mission ("AMM") sects.
 
 
 29
 As a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy. Thus, in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 167-68, 92 S.Ct. 1965, 1968-69, 32 L.Ed.2d 627 (1972), the Supreme Court held that an African-American who never actually applied for membership to the Moose Lodge lacked standing to challenge the club's all-white membership requirement. Similarly, in Allen v. Wright, 468 U.S. at 755, 104 S.Ct. at 3326-27, the Court held that plaintiffs, parents of children who had never applied for admission to private schools with allegedly racially discriminatory admissions policies, had no standing to challenge the tax-exempt status of those private schools. See also Madsen v. Boise State Univ., 976 F.2d 1219, 1220 (9th Cir.1992) (denying standing to university student who failed to apply for handicap parking permit); Albuquerque, 930 F.2d at 57 (denying standing to plaintiffs who sought to extend Indian hiring preferences to jobs for which they had never applied); Doe v. Blum, 729 F.2d 186, 189-90 (2d Cir.1984) (denying standing to plaintiffs--sexually active teenagers--who never applied for and therefore were never denied desired family planning benefits); cf. Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (holding that claims of immigrants who never applied for amnesty, challenging alleged mistakes made in administration of amnesty provision, were not ripe).
 
 
 30
 This threshold requirement for standing may be excused only where a plaintiff makes a substantial showing that application for the benefit (or, in this case, registration) would have been futile. See International Bhd. of Teamsters v. United States, 431 U.S. 324, 365-66, 97 S.Ct. 1843, 1869-70, 52 L.Ed.2d 396 (1977) (persons deterred from applying for employment where employer has clearly established "Whites Only" policy have standing); Sammon v. New Jersey Bd. of Med. Exam'rs, 66 F.3d 639, 643 (3d Cir.1995) (midwives have standing to challenge state's 1800 hour training requirement for midwife certification without going through training exercise). However, an unsupported claim of futility is not enough to excuse a plaintiff's failure to apply. See Albuquerque, 930 F.2d at 57.
 
 
 31
 In addressing Jackson-Bey's claim that it would have been futile for him to have registered as an MST member, it is helpful to understand the nature of Woodbourne's requirement that an inmate register his religious affiliation before being allowed the privileges accompanying the exercise of that religion. While inmates are not stripped of their constitutional rights simply by virtue of their imprisonment, Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 2974-75, 41 L.Ed.2d 935 (1974), including their right to religious freedom, Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), they retain only those rights consistent with legitimate penological objectives, Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir.1995), and reasonable limitations on the accommodation of religious practices necessary to achieve those objectives are permitted. Registration is one such limitation.
 
 
 32
 Registration of religious affiliation at Woodbourne entails only a modest act of commitment by the inmate, while serving several legitimate penological interests. By registering, the inmate formally declares his religious affiliation. This has significance because prison officials are not required to accommodate an inmate's religious demands without regard to whether or not the inmate is actually a member of the religion. See, e.g., Farid v. Smith, 850 F.2d 917, 926 (2d Cir.1988) (summary judgment appropriate where inmate failed to prove that he sincerely held any religious belief mandating use of Tarot cards).
 
 
 33
 Registration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times. Registration also allows prison officials to gauge the interest in any particular religion on the part of the inmate population and thus decide whether a "congregation" should be allowed. Registration puts the institution on notice that certain religious accommodations will likely be sought and thereby provides the institution with time to consider if and how to implement them. This, in turn, makes such accommodations more likely and thereby reduces the circumstances in which judicial intervention will be needed. In short, registration places, at most, a slight burden on an inmate's right to religious freedom while serving as an important and beneficial "bright line" that enables prison officials to ascertain the seriousness of the inmate's religious commitment and respond accordingly.
 
 
 34
 Jackson-Bey points to several documents which, he argues, demonstrate that registration, in his case, would have been futile. First, on March 9, 1993, Mark Sheppard of the DOCS Division of Support Operations wrote to inmate Shahid Muhammed that DOCS's "established policy" recognizes only two Islamic sects, Sunni Muslim and AMM. Second, while DOCS Directive No. 4202 lists the religions recognized by Woodbourne, as including Christian, American Indian, Jewish, Muslim, and Zen Buddhism, under Muslim, the directive lists only the Sunni and AMM sects. Third, an August 1990 DOCS memorandum indicated that inmates were prohibited from wearing fez head coverings. Also, Jackson-Bey submitted an affidavit of inmate Larry D. Gilmore-Bey that, in addition to stating that Jackson-Bey was a member of MST, stated:
 
 
 35
 The defendants [sic] present policy and procedures recognize only the Sunni Muslims and the American Muslim Mission groups, and therefore make no distinction in their records upon admission to the facilities of the different Islamic Sects. Subsequently, regardless of one's denomination/ Sect, defendants will state only that an inmate is Muslim.
 
 
 36
 Although the above directives and the prison policy manual, effective at the time of Jackson-Bey's father's funeral, recognized only the Sunni and AMM Islamic sects, it is not at all clear that the MST sect would not have been accommodated had Jackson-Bey registered and formally brought the subject to the attention of defendants. Indeed, the record in this case, including the subsequent actions of prison officials, points to the contrary conclusion.
 
 
 37
 In response to Jackson-Bey's interrogatory requests, defendants have asserted, and Jackson-Bey does not challenge, the following: (i) "[a]s there was in 1994 and in the present as well only one (1) registered Moorish Science Temple member at Woodbourne ... there was no basis to permit or promote a congregation (i.e. two or more gathered) or activity. As there was a congregation of one, there were no valid requests to assemble for worship service and religious education study;" (ii) effective June 22, 1995, all registered members of the Moorish Science Temple were accorded permission to wear the prescribed red fez; and (iii) all the requests of the one registered MST member have been granted. Jury Trial Demanded & Defs.' Resp. to Pl.'s First Set of Interrogs., Sept. 12, 1995 (No. 95 Civ. 2349(CSH)). In the wake of this lawsuit, defendants contacted Brother El-Love, a spiritual advisor of MST members, to obtain information regarding the specific practices of the MST. Defs.' Resps. to Pl.'s Second Req. for Admis., Dec. 21, 1995 (No. 95 Civ. 2349(CSH)). "[I]t was not until 1995 that DOCS was apprised of the practice and tenets of the MST[ ] faith.... Thereafter, the MST[ ] faith was integrated into the DOC system, and DOCS took steps to accommodate ... religious practices [of] ... MST[ ] follower[s]." Gilmore-Bey v. Coughlin, 929 F.Supp. 146, 152-53 (S.D.N.Y.1996).
 
 
 38
 From the foregoing, we are unable to say that, if Jackson-Bey had followed the simple procedure of filling out the one-page form to register as an MST member at the time of his father's funeral, he would not have received the accommodation of his religious needs.
 
 
 39
 Finally, Jackson-Bey claims that because he is registered as a Muslim on facility records, he need not specify that he is a member of MST since the directives do not require a prisoner to specify his specific sect of Islam. This argument is without merit. We construe the Woodbourne registration directive to require that an inmate register his affiliation with a specific religious sect in order to gain the benefit of being allowed to wear the accoutrements and receive other accommodations that pertain to that particular religious sect. Jackson-Bey's proposed construction of the registration requirement would undermine many positive benefits to prison administration that registration provides.
 
 CONCLUSION
 
 40
 In sum, because registration is a reasonable standing threshold and because Jackson-Bey failed to register and has not made a substantial showing that registration would be futile, we hold that Jackson-Bey lacks standing and affirm.
 
 KEARSE, Circuit Judge, dissenting:
 
 41
 I respectfully dissent. In February 1995, when his father died, Jackson-Bey, a prisoner, requested and was denied permission to wear special clothing, required because he was a member of the Moorish Science Temple ("MST") religion, to his father's funeral. In defense of Jackson-Bey's claim that the denial violated his First Amendment rights, the prison officials have taken the position that Jackson-Bey was not entitled to such permission because he had not registered as an MST adherent. The record, however, viewed in the light most favorable to Jackson-Bey, see, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136-37, 119 L.Ed.2d 351 (1992), reveals that prison officials did not acknowledge MST as a religion in February 1995. Indeed, as late as December 1995, responding to a formal request for admissions in this action, defendants stated that they were still seeking official information on MST, and they refused to admit that MST was a religion. Whatever might ultimately be determined as to the merits of Jackson-Bey's claim, I cannot accept the majority's conclusion that he does not have standing to sue.