**WESTCHESTER COUNTY CORRECTIONS, et. al. Plaintiffs**

v.

**COUNTY OF WESTCHESTER, et al. Defendants**

**No. 99 CIV. 11685(SCR).**

United States District Court, S.D. New York.

Nov. 24, 2004.

Robert David Goodstein, Goodstein & West, Esqs., New Rochelle, NY, for Plaintiffs.

Alan D. Scheinkman, Lori Ann Alesio, White Plains, NY, Matthew T. Miklave, Epstein, Becker & Green, New York, NY, for Defendants.

## AMENDED MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge.

## I. Background

### A. Procedural Posture

This action consists of three separate lawsuits [1] involving related parties and related causes of action that have been consolidated for the purpose of efficiently resolving common issues. The plaintiffs in these cases include approximately sixty-four male and female correctional officers and their union, the Westchester County Correction Officers Benevolent Association ("COBA") (collectively the "Plaintiffs"). The defendants are the County of Westchester, Andrew J. Spano, the County Executive, and Rocco A. Pozzi, the Commission of the County's Department of Corrections ("DOC") (collectively the "Defendants"). The Plaintiffs filed complaints seeking damages and injunctive relief for alleged violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), the Equal Protection Clause of the Fourteenth Amendment of the Constitution as applied pursuant to 42 U.S.C. § 1983, and the New York State Human Rights Law.

The Plaintiffs moved for summary judgment, asserting several arguments: (1) the Defendants' gender-conscious policies impose more than de minimus restrictions on the Plaintiffs' employment; (2) the Defendants' policies violate the Equal Protection Clause; (3) the Defendants cannot establish a bona fide occupational qualifica-

---

1. *Westchester County Correction Officers Benevolent Association, et al. v. County of Westchester,* 99 Civ. 11685; *Fischetti, et al. v.* *County of Westchester,* et al., 00 Civ. 8981; and *Burke, et al. v. County of Westchester et al.,* 00 Civ. 1779.

tion (BFOQ) defense. The Defendants have made a cross motion for summary judgment, arguing that: (1) gender constitutes a BFOQ for correctional officers; (2) a gender restriction on transportation posts does not constitute an adverse employment action under Title VII; (3) COBA is not a proper party in this case.

## B. Statement of Facts

The DOC complex consists of three separate divisions: the Jail and Penitentiary Divisions, which house male inmates, and the Women's Unit, which houses female pre-trial detainees and inmates generally serving sentences of less than one year. During 1999, the year prior to the implementation of the policy at issue in this case, the DOC housed approximately 1200 inmates, of which approximately eighty-six percent were males and fourteen percent were females. At the same time, the DOC employed approximately 770 correction officers, of whom approximately 616 were male and 154 were female.

The issue of gender-based assignments of correctional officers has been an ongoing source of dispute between the parties to this case.[2] Prior to June 1988, the unit housing male prisoners at the County's correctional facility was staffed exclusively with male correction officers and the unit housing female prisoners was staffed exclusively with female officers. Two male correctional officers who were not considered for promotion at the female unit brought suit against the County. By stipulation, the County waived any BFOQ defense. The Second Circuit held that the plaintiffs had established a prima facie case of discrimination and, because the County had failed to prove that the plain-

tiffs were otherwise unqualified for promotion at the female unit, the County was liable under Title VII and § 1983. *See Berl v. County of Westchester,* 849 F.2d 712, 716 (2d Cir.1988). Following this case, the County changed its policy, allowing male correction officers to be posted in the Women's Unit.

In June 1993, the DOC issued a policy directive requiring that a female officer be assigned to the transportation of female inmates by car or through Elmwood Hall to inmates' work locations. This policy was challenged by COBA member Regina Ehren in a case entitled *Ehren v. County of Westchester,* 95 Civ. 0700(CLB). In settling this action, the County once again reversed its policy, thereafter permitting all correction officers to be assigned to the posts in question regardless of their gender.

Since at least 1988, the County has had in place policies prohibiting personal relationships and sexual relationships of any kind between inmates and correction officers and sexual harassment by corrections officers. Nevertheless, a series of incidents of voluntary and involuntary sexual activity between correctional officers and inmates have occurred: a male correction officer was found to have engaged in consensual sexual intercourse with a female inmate in 1993; a male correction officer was convicted by a jury of raping a female inmate in her cell in 1996; and a court found a correction officer guilty of sexually abusing a female inmate in 1998. Moreover, in January 2000, four male correction officers were arrested on charges of rape and/or sodomy, official misconduct and sexual abuse. One of the officers pleaded guilty to third degree rape, two were ac-

---

**2.** Of note, the collective bargaining agreement between COBA and the County expressly provides that "the Department in its sole and exclusive discretion may limit posts to a particular sex." The DOC prohibits officers from strip-searching inmates of the opposite gender, but Plaintiffs do not appear to have any objection to this gender-based restriction.

quitted after jury trial, and the charges against the other were eventually dropped. As Plaintiffs point out, however, not all incidents have been between correction officers and inmates of opposite genders. In particular, two male officers have been found to have engaged in acts of oral sodomy with male inmates.

Following these incidents, the County re-imposed gender-based restrictions on the assignment of correctional officers to the supervision and transportation of female inmates. In particular, the County made two major policy changes. First, the County adopted a policy banning male correction officers from working housing posts in the Women's Unit. Pursuant to this policy change, the DOC transferred all male correction officers assigned to the Women's unit to units housing male prisoners. Although their work locations changed, all correction officers were assigned to the same shifts and the same squad to which they were previously assigned after the transfers. Second, since at least May 1999, the DOC has required that, whenever a female inmate is to be transported, one of the officers transporting the inmate must be female. As a result, a male correction officer who happens to be working the transportation post at the time a female inmate needs to be transported may temporarily be reassigned to another post while a female correction officer transports the female inmate.

In addition to these changes, the County pursued other "remedial efforts." In particular, the County announced a program to increase training for staff and correction officers and installed cameras and door alarms to the female unit. The County does not believe that cameras are a com-

plete solution, however, because cameras do not cover all areas of the unit due to privacy concerns, and also because, according to the County, males who are "highly motivated" to commit improper sexual acts "will find a way." [3]

An important development occurred in this case after the parties' summary judgment motions were fully briefed. In June 2004, the County closed the Women's Division at the Westchester County Correctional Facility, and transferred all female inmates to the jail division, fourth floor. At the same time, the County announced another reversal of its policy on housing posts in the Women's Unit, this time revoking its ban on male correction officers serving in any female housing post. Plaintiffs claim, and Defendants have not disputed, that of twenty-three correctional officers now assigned to the fourth floor of the jail division, twenty-one are males are two are females. In light of these developments, Plaintiffs concede that its request for injunctive relief regarding the housing policy is now moot, but point out that its claim for damages allegedly incurred as a result of the housing policy is unaffected. Defendants have argued that its policy change does not affect the merits of its prior arguments because the circumstances (including the physical dimensions) of the new facility housing female inmates are different. The transportation policy at issue in this case remains in place and, as such, Plaintiffs' claims for related damages and injunctive relief are also unaffected.

## II. Analysis

### A. Background

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "there is no genuine issue as to any

---

**3.** To bolster this argument, Defendants point out that one of the incidents discussed above was committed in the tunnel connecting the women's unit and the jail, which was being monitored by closed-circuit television at the time.

material fact[.]" FED. R. CIV. P. 56(c). Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.*

## B. Whether A Gender Restriction On Transportation Posts Constitutes An Adverse Employment Action Under Title VII:

■ Defendants argue that the temporary reassignment of male correction officers to facilitate the transportation of female inmates by female correction officers does not "rise to the level of a tangible or significant alteration in the terms and conditions of employment" and cannot form the basis of liability. Plaintiffs respond that changing the duties of such male officers, even temporarily, constitutes a significant alternation in terms and conditions. Plaintiffs' argument is unavailing.

The Second Circuit has held that a qualifying adverse action by an employer is a "materially adverse change in the terms and conditions of employment." *See Weeks v. New York State*, 273 F.3d 76, 85 (2d Cir.2001), *quoting Galabya v. New York City Board of Educ.*, 202 F.3d 636, 640 (2d Cir.2000). The challenged action must "affect[ ] employment in a way that is

both detrimental and substantial." *Weeks*, 273 F.3d at 87 (quoting *Bernheim v. Litt*, 79 F.3d 318, 327 (2d Cir.1996) (Jacobs, J., concurring)). The types of actions that meet this test include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation. *Weeks*, 273 F.3d at 85. Of particular relevance to the facts of this case, the action must involve a change in working conditions that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 86 (holding that the transfer of the plaintiff to another office and the reassignment of the plaintiff's tasks to colleagues did not constitute adverse actions). Not only are Plaintiffs' objections to the transportation policy likewise predicated on the mere reassignment of male officers, the reassignments at issue are temporary, lasting only as long as it takes to transport female inmates. It is clear, therefore, that Defendants' policy does not constitute an adverse action for the purposes of Title VII. As such, the transportation policy cannot be form the basis of liability in this case.[4]

## C. Whether The Union Is A Proper Party To The Action:

The Defendants argue that COBA lacks standing to litigate this case because it has

---

**4.** The parties briefed this issue in particular reference to a claim brought by Plaintiff Gilson. The holding here would, of course, also apply to any other plaintiffs asserting the same claim. Moreover, this result implies that § 1983 claims cannot be predicated on the transportation policy either. *See Feingold v. New York*, 366 F.3d 138, 159 (2d Cir.2004) (where a plaintiff's equal protection claim under § 1983 parallels his Title VII claim, the "elements of one are generally the same as the elements of the other and the two must stand or fall together."). *See also Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir.1996) (stat-

ing that "Title VII law ... is utilized by courts considering § 1983 Equal Protection claims" and recognizing that "several circuits have held that, when § 1983 is used as a parallel remedy with Title VII in a discrimination suit ... the elements of the substantive cause of action are the same under both statutes."). The same is true of any claims under the New York Human Rights Law, N.Y. EXEC. LAW § 296(1)(e). *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1177 (2d Cir.1996) (New York courts rely on federal law when determining claims under the New York Human Rights Law).

not claimed any injury to the organization other than injuries allegedly suffered by its members. The Plaintiffs insist that COBA has standing both to protect the interests of its members who are not parties to these actions, and because dissension between COBA members caused by the Defendants' policies constitute injury to COBA itself.

■ Because the judicial power of the United States extends only to the resolution of cases and controversies, U.S. Const. art. III, § 2, courts have always required that a litigant have "standing" to challenge the action sought to be adjudicated. *See Jackson–Bey v. Hanslmaier,* 115 F.3d 1091, 1095 (2d Cir.1997). At a minimum, Article III requires the party who invokes the court's authority to show that (i) he personally has suffered some actual or threatened injury as a result of defendants' putatively illegal conduct; (ii) the injury is fairly traceable to the challenged action; and (iii) the injury is likely to be redressed by a favorable decision. *Id.*

■ An organization can achieve standing in two ways: based on alleged injury to itself, or as a representative of its members. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). To bring suit on behalf of its membership, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 649 (2d Cir.1998), *quoting Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343–45, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Defendants argue that COBA has no standing in part because "[i]t is the correction officers who must participate in the litigation...[and] testify as to...the alleged damages they claim to have suffered...." Whether an association has standing to invoke the court's remedial powers on behalf of its members "depends in substantial measure on the nature of the relief sought." *Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Notably, the Court in *Warth* stated that "in all cases in which we have expressly recognized standing in associations to represent their members," the association was seeking "a declaration, injunction, or some other form of prospective relief." *Id.* The Court went on to deny the association plaintiff standing to seek damages for alleged injuries to its members because it "allege[d] no monetary injury to itself" and because "the damages claims [we]re not common to the entire membership, nor shared by all in equal degree." *Id.* Because "whatever injury may have been suffered [was] peculiar to the individual member concerned, ... both the fact and extent of injury...require[d] individualized proof." *Id.* at 515–16, 95 S.Ct. 2197.

■ In this case, Plaintiffs are seeking monetary and injunctive relief arising from the County's housing and transportation policies. Having already determined that Plaintiffs can maintain no causes of action arising from the transportation policy, and given that the County's recent change in its housing policy renders Plaintiffs' claim for injunctive relief moot, all that remains are the Plaintiffs' claim for damages arising from the housing policy. Notably, the crux of Plaintiffs' complaint is that the Defendants' policy results in dissimilar treatment of male and female correction officers. Therefore, it is clear that the fact and extent of injury require individualized

proof.[5] As such, COBA has no standing to seek damages on behalf of its members in this case, whether they are named in this litigation or not.[6]

### D. Whether gender constitutes a BFOQ:

Under § 703(e)(1) of Title VII, an employer may discriminate on the basis of "religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e)(1). Therefore, in order to sustain a BFOQ defense, the Defendants must show 1. the job qualifications that the employer invokes to justify his discrimination must relate to the essence or central function of his business, and 2. they must be "reasonably necessary" to the particular business.

See *Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 414–415, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985).[7] In applying the defense, it is important to recognize that the BFOQ defense is intended to be an "extremely narrow exception" to the general prohibition of discrimination of the basis of sex. See, e.g., *Dothard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

With respect to the first requirement, the Supreme Court has held that "[t]he essence of a correctional counselor's job is to maintain prison security." *Dothard v. Rawlinson,* 433 U.S. 321, 335, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). The County's gender-conscious housing policy was adopted for the purpose of protecting female inmates from unwanted or otherwise inappropriate sexual encounters with male correction officers.[8] It seems relatively

**5.** In response, Plaintiffs cite *International Union, United Auto., etc. v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), but this case is not helpful to their argument. The Court in *Brock* held that the plaintiff union did have standing, even though the benefits of its individual members were at issue, because the suit raised a "pure question of law" and "[n]either the[ ] claims nor the relief sought required the District Court to consider the individual circumstances of any aggrieved UAW member." *Id.* at 287, 106 S.Ct. 2523.

**6.** Plaintiffs also argue that COBA has itself been injured by Defendants' policies. In particular, they claim that the policies have caused dissension between members that has harmed its ability to serve as a collective bargaining agent. COBA has standing based on such alleged injuries to itself and can, at least in theory, recover for any such damages they are able to prove. Defendants respond that COBA has no standing to challenge gender-based policies because COBA is party to a collective bargaining agreement that expressly authorizes the County to restrict posts for a particular gender. Although Defendants make this argument without reference to any legal framework, Defendants appear to be arguing that COBA has waived the rights it is

asserting in this case. Assuming that COBA could waive its right to assert the claims it has made in this case, Defendants' argument fails, because any such waiver must be clear and unmistakable. See *Wright v. Universal Mar. Serv. Corp.,* 525 U.S. 70, 80, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998). Although the collective bargaining agreement allows the DOC discretion to make gender-based assignments, it in no way states that COBA is waiving any particular statutory or other legal rights. As such, it does not constitute an adequate waiver.

**7.** As Defendants point out, there is precedent in this District for a third prong of this test—for requiring that the defendant show that some less restrictive alternative is not available to avoid the classification. See *Jennings v. New York State Office of Mental Health,* 786 F.Supp. 376, 381 (S.D.N.Y.1992). The United States Supreme Court has addressed and applied the BFOQ defense without including this third prong and, in the absence of controlling precedent to the contrary, we find no reason to include it either.

**8.** Defendants also cite evidence indicating that one of the purposes of the policy was to protect male correction officers from false

clear, therefore, that the policy at issue satisfies the first requirement of the BFOQ defense.

Whether the policy satisfies the second requirement, however, is much more problematic. The Defendants make several arguments. First, they argue that the past history of incidents, which is summarized above, indicates that "some unknown number of male correction officers are likely to be 'highly motivated' to commit acts of sexual abuse or coercion...." Second, they argue that female inmates who are past victims of sexual abuse are harmed by the mere presence of male officers.[9] Third, they claim it is "virtually impossible" for female inmates to have a sense of privacy if males are posted to their unit. Further, Defendants argue that their policy is necessary because every alternative approach has proven incapable of preventing inappropriate incidents involving female inmates.[10] Most importantly, Defendants argue that security cameras have proven inadequate because, on one occasion, several correctional officers observed one of their colleagues having an inappropriate sexual encounter with female inmates on camera but did not intervene to stop the incident.[11] In light of these facts, Defendants argue that "no other alternative means exists to protect the inmates other than a ban on male correction officers from female housing posts."[12]

The Defendants' argument is unconvincing for various reasons. First and foremost, controlling precedent does not permit gender-based discrimination in order to prevent hypothetical safety risks posed by a small percentage of male correction officers, even to the extent the likely wrongdoers are undetectable *ex ante*. A valid BFOQ defense requires a factual showing that "all or substantially all" members of the targeted group would be "unable to perform safely and efficiently the duties of the job involved." *Dothard*, 433 U.S. at 333, 97 S.Ct. 2720 (internal quotations omitted); *Int'l Union, United Auto., etc. v. Johnson Controls*, 499 U.S. 187, 207, 111 S.Ct. 1196, 113 L.Ed.2d 158 (rejecting an employment policy that excludes all fertile women simply because it is impossible to tell which women will become pregnant). The Defendants have failed to establish that all or substantially all male correction officers pose a risk of inappropriate sexual conduct with female inmates to justify a complete ban. Rather, they base their argument on incidents in-

accusations. In light of the minimal attention given to this purpose in Defendants' briefing papers, this purpose was secondary at best.

**9.** For this proposition (and some others), Defendants rely on a report produced by Terry A. Kupers. Plaintiffs argue that this report should be rejected pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We do not reach this issue here because, even assuming that the report is admissible, we find for reasons described below that the findings in this report are not particularly persuasive in this case.

**10.** Alternatives discussed by the Defendants include training of officers, door alarms that sound when inmate cells are opened at inappropriate times, screening sexual predators when hiring officers, and self-policing.

**11.** Also, with respect to cameras, Defendants note that privacy concerns and financial limitations preclude the positioning of cameras in enough places to cover the entire female unit, and that cameras tend to break down.

**12.** Defendants dedicate substantial sections of their papers to rejecting Plaintiffs' repeated assertions that Defendants are barred by principles of claim and/or issue preclusion from asserting a BFOQ defense in this case. We do not understand Plaintiffs to have made any such argument, and even to the extent they have, it is irrelevant in light of our decision on the merits of the BFOQ defense in this case.

volving four officers and evidence showing that "some unknown number of male correction officers (less than all correction officers, but certainly more than zero of them) are likely to be sexual predators." Under Defendants' theory, race- or gender-based discrimination would be legally cognizable if they could show that some small number of those discriminated against will actually abuse their rights. Fortunately, the law does not require such perfection.

It is admittedly true that the Court in *Dothard* did hold that a regulation banning women from certain positions in Alabama prisons was within the confines of the BFOQ exception. *See Dothard* 433 U.S. at 336–37, 97 S.Ct. 2720. However, the Court was careful to limit its holding to the relatively unique facts of the case before it, including the "rampant violence" and "jungle atmosphere" of Alabama's maximum-security male penitentiaries. *Id.* at 334, 97 S.Ct. 2720 (internal quotations omitted). Specifically, the Court noted that inmates in Alabama's prisons were not segregated according to their offense level or dangerousness, leaving the estimated 20% of male prisoners who were sex offenders scattered throughout the dormitory facilities. *Id.* at 335, 97 S.Ct. 2720. Concerned that sex offenders and other inmates would assault female guards, the Court concluded that "[a] woman's relative ability to maintain order...could be directly reduced by her womanhood." *Id.* Obviously, there is much to distinguish *Dothard,* predicated on the protection of female officers and the prison environment from attacks by proven, violent offenders, from the Defendants' interest in protecting female inmates from an unspecified minority of male correction officers. *See Everson v. Mich. Dep't of Corr.,* 222 F.Supp.2d 864, 895 (E.D.Mich.2002) (refusing to permit a blanket ban on male on employment of male officers in female prisons simply because a few are likely to be involved in improper activities).

Moreover, there are reasons to doubt many of the specific justifications advanced by the Defendants in this case. If the mere presence of male officers poses a risk of sexual assault and causes distress to past victims of sexual abuse, it is difficult to understand how the County justifies allowing male correction officers to occupy any posts that would bring them in contact with female inmates,[13] particularly in light of their concerns that not all corners of the women's unit can be covered by cameras and that, even where there are cameras, male correction officers are prone to ignore abusive conduct. Moreover, although the incident in which correction officers witnessed on video, but did not stop, a sexual encounter is undoubtedly disturbing, it may well have been the result of leaving correction officers to police each other, rather than having responsible, superior officers monitoring cameras.[14] And, of course, it is impossible to understate the extent to which the County's recent policy reversal reduces the County's credibility with respect to many of the arguments it has made. Were the County to be held now to the statements it made in its briefs, it is impossible to escape the conclusion that its recent policy change has placed female inmates in great and unavoidable peril. We find it hard to believe the County would do this if it were actually the case.

---

**13.** The Defendants themselves argue that the County's actions were "exceedingly limited in scope" given that males were barred from working housing posts—not all posts.

**14.** The court finds it difficult to believe that the County could not find any individuals trustworthy enough to monitor cameras and intervene if necessary.

For these reasons, the court finds that the County has not established a valid BFOQ defense.[15] It is worth emphasizing, in conclusion, that this holding is, of course, limited to the facts and circumstances of this case. Our finding that Defendants' policy banning male officers from all housing posts in female units makes no judgment about, for example, regulations requiring that there be a certain number of women assigned to units housing female inmates, or that male officers be banned from discrete tasks, such as body searches, urine collection, monitoring showers, etc., which would, of course, present entirely separate questions.

### III. Conclusion

Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

It is so ordered.

---

15. Given this conclusion, it is unnecessary to separately analyze the merits of Plaintiffs' § 1983 claim. The Supreme Court set forth its test for gender-based equal protection claims in *United States v. Virginia*, 518 U.S. 515, 532–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Even to the extent that Defendants have established an important government interest, its failure to establish that gender-based assignments are reasonably necessary to achieving prison safety implies that its ban on male correction officers is not substantially related to achieving its objectives. *See Dothard*, 433 U.S. at 334, n. 20, 97 S.Ct. 2720 (finding no reason to separately consider whether the regulation at issue violated the Fourteenth Amendment). *See also Feingold v. New York*, 366 F.3d at 159.